NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINDA HOLPP,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>INTEGRATED COMMUNICATIONS, CORP.,<br><br>　　　　　　Defendant. | Civ. No. 03-3383 (WGB)<br><br>**O P I N I O N** |

**APPEARANCES:**

Neil H. Deutsch, Esq.
Jonathan I. Nirenberg, Esq.
**DEUTSCH RESNICK, P.A.**
One University Plaza, Suite 305
Hackensack, NJ 07601

　　　Counsel to Plaintiff

Kenneth John Kelly, Esq.
James Flynn, Esq.
**EPSTEIN, BECKER & GREEN, P.C.**
Two Gateway Center, 12th floor
Newark, NJ 07102

　　　Counsel to Defendant

**BASSLER, SENIOR DISTRICT JUDGE:**

　　　In May 1998, Plaintiff Linda Holpp ("Holpp" or "Plaintiff") began working for Integrated Communications Corporation ("ICC" or "Defendant"), an advertising agency specializing in healthcare products.  On October 2, 2002, Plaintiff took medical leave due

to back problems.  When Plaintiff returned from medical leave two
months later, ICC terminated her employment.  This lawsuit
ensued.

Plaintiff's three-count complaint ("Complaint") alleges that
ICC: (1) interfered with her rights under the Family and Medical
Leave Act, 29 U.S.C. § 2601, et seq. (the "FMLA"); (2) failed to
reinstate her in violation of the FMLA; and (3) retaliated
against her in violation of the New Jersey Conscientious Employee
Protection Act, N.J.S.A. § 34:19-1, et seq. ("CEPA").[1]  Pursuant
to Fed. R. Civ. P. 56, Plaintiff filed a motion for partial
summary judgment as to Count One.  Defendant moved for summary
judgment on all Counts of the Complaint.

The Court has jurisdiction over Plaintiff's FMLA claims
pursuant to 29 U.S.C. § 2617 and 28 U.S.C. §§ 1331, 1343(a)(4)
and 1367(a).  Venue in the district of New Jersey is proper
pursuant to 28 U.S.C. § 1391(b).

For the reasons set forth in this Opinion, the Court **grants**
ICC's motion for summary judgment and **denies** Holpp's motion for
partial summary judgment.

---

[1]     The Court will not consider Plaintiff's Third Count
CEPA claims and it deems them voluntarily dismissed.  In a
footnote to Plaintiff's Opposition To Defendant's Motion For
Summary Judgment, Plaintiff writes that "Although [she] believes
has [sic] sufficient evidence to survive summary judgment on her
CEPA claim, since she believes Defendant fired her because she
took an FMLA leave irrespective of her 'whistleblowing' activity,
she has decided not to pursue her CEPA claim." (Plaintiff's Br.
at 2, n.1.)

I.    **BACKGROUND**

A. Plaintiff's medical leave.

ICC is an advertising agency, whose clients are primarily manufacturers of healthcare products.  Plaintiff began working for ICC in May 1998, and, prior to her termination, held the position of Senior Vice President, Group Account Supervisor. Plaintiff was responsible for managing ICC's Aventis Pasteur ("Aventis") account, including overseeing all work done by ICC on behalf of Aventis, handling Aventis' new business pitches, and serving as the primary contact person at ICC for all major Aventis account issues.

In November 1998, Holpp was in a car accident and suffered injuries to her back, neck and head.  According to Plaintiff, the following year, her Orthopedist diagnosed her with two herniated disks and referred her to a Neurologist.  (Holpp Dep. Tr. 9:12-11:4.)  With medication, Holpp was able to continue working at ICC until September 2002.  (Holpp Dep. Tr. 14:1-14:14.)

On September 9, 2002, Plaintiff informed her supervisor, Paul O'Neill, ICC Executive Vice President, Director of Client Services, ("O'Neill") that she was not able to go into work that day due to her back condition.  As Plaintiff testified at her deposition:

> I told [O'Neill] that I was going to be out
> [that day].  That I was in extreme pain,
> excruciating pain.  And I was able to get an
> appointment with my neurologist [that]

3

> afternoon or whatever, late [that] morning.
> And I would call him as soon as I arrived
> back from the doctor to let him know what the
> doctor says.

(Holpp Dep. Tr. 150:18-24.)

After seeing her doctor, Plaintiff called O'Neill.  The parties dispute the precise details of the conversation.  By Plaintiff's account, she told O'Neill that, pursuant to her doctor's instructions, she could not work for at least six weeks.  O'Neill purportedly told Plaintiff that he would "take care of it."  (Holpp. Dep. Tr. 153:13-16; 156:2-157:5.)

According to O'Neill, however, Plaintiff said that she could not drive to work for several weeks because of her back problems; therefore, since it was a driving issue, he asked her if she would like to work from home.  O'Neill testified at his deposition that Plaintiff never said that she could not work, nor did she raise the issue of a medical leave at any time during the conversation.  (O'Neill Dep. Tr. 97:14-104:5.)

On September 12, 2002, three days after Plaintiff told O'Neill that she would not be coming into the office, Plaintiff called Larry Turner ("Turner"), ICC's Director of Human Resources.  (Holpp Dep. Tr. 157:6-15.)  According to Plaintiff, she told Turner that she "was going to be out sick for six weeks" and that she had "discussed it with Paul."  (Holpp Dep. Tr. 157:16-19.)  Turner allegedly told Plaintiff to fax him a copy of a note from her doctor so that he could send her the "necessary

4

forms." (Holpp Dep. Tr. 157:21-167:19.) As Plaintiff describes the conversation:

> A.   I shared with [Turner] that I needed to be out sick. And that if I could help in any way. I told Paul that. But I could not work. And he told me to get better. You know, don't worry about work. Get better. He would be sending the forms.
> Q.   Did he tell you not to work?
> A.   Told me to take care of myself and get better. And not to worry about work...

(Holpp Dep. Tr. 167:10-17.)

According to the Plaintiff, on or around September 13, she faxed Turner a copy of her doctor's note. (Holpp Dep. Tr. 148:10-24.) Turner testified that the following week he explained to Holpp that as long as she was working from home she would continue to collect full salary; it was his understanding Plaintiff was attempting to do so. (Turner Dep. Tr. 18:15-19:17; 20:4-7.)

Over the course of the last three weeks of September 2002, Plaintiff remained at home and continued to work and have telephone contact with Aventis Account Managers. (Holpp Dep. Tr. 197:7-200:21; 226:5-20.) During the same time period, Plaintiff tried to contact various individuals in ICC's personnel department because she had not received any disability forms. Plaintiff testified:

> A.   ...I also remember telling [Turner] that during this period of time I was not working from home. I was helping out to

5

> the best of my ability because I was a
> conscientious employee.  But I would not
> consider it working from home.  That I
> was out sick.  And Larry told me, 'Well,
> you cannot collect from two places.
> We're paying your salary.'  I told him,
> 'I don't want my salary.  I want to be
> out on sick leave as my doctor stated.
> I am not working.'  And then it went on
> to a conversation that [accounting was]
> putting my time in as work time.

(Holpp Dep. Tr. 176:5-17.)

When Plaintiff asked Turner why she was being paid rather than being put on sick leave, Plaintiff claims Turner told her "that he thought Paul O'Neill was trying to do [her] a favor because [O'Neill] didn't want [Plaintiff] to use up [her] sick time." (Holpp Dep. Tr. 179:19-21.)

Plaintiff also spoke to William Young ("Young"), Executive Vice President and Chief Administrative Officer of Lowe Healthcare, ICC's parent company, about her leave.  As Plaintiff testified:

> Q.   What did you say to Young, what did he
>      say to you?
> A.   'Nobody is sending me these forms.  I
>      don't know what to do.  I can't work
>      like this.  I cannot do my job.  And no
>      one's putting me out on leave.  And my
>      concern is if I am put in a situation,
>      I'm not looking very intelligent to the
>      clients.  And I can't do my job.  So, I
>      don't know what to do.  How come
>      nobody's returning the calls?  Nobody's
>      sending me disability forms.  It's very
>      strange to me Bill.  I don't understand
>      this.  You're the head guy.  Please let
>      me know.'
> Q.   Did he say anything to the effect that

6

```
                       he knew about your situation?
              A.       He told me that [Turner] was handling
                       it.  And he would follow up with
                       [Turner].
```

(Holpp. Dep. Tr. 212:13-213:1.)

Plaintiff emailed Turner and O'Neill on October 2, 2002 requesting that they send her disability forms. (Plaintiff's Br. at 15.) Sometime after October 2, Plaintiff received a telephone call from O'Neill and Steve Viviano ("Viviano"), President of ICC. As Plaintiff testified at her deposition, "[O'Neill] told me that they were sending me the disability forms. And that he would handle the [Aventis] account now. And that he would tell the staff not to contact me and the client. That he would now communicate that." (Holpp Dep. Tr. 202:9-13.) Plaintiff received the forms on October 7, 2002, and her FMLA leave was made effective October 1, 2002. (Plaintiff's Br. at 16.)

B. Plaintiff's performance with Aventis.

Plaintiff worked exclusively on ICC's Aventis account. (Holpp Dep. Tr. 49:14-18.) On August 30, 2002, Chad Hoover ("Hoover"), then Executive Director of Marketing at Aventis, met with O'Neill. According to Hoover, the purpose of the meeting was to "clearly outline his concern of the business between ICC and Aventis Pasteur; specifically [Holpp]." (Hoover Dep. Tr. 26:9-18.) Hoover advised O'Neill that he was not personally satisfied with Plaintiff's performance and that he had received numerous complaints about her from senior managers. (Hoover Aff.

7

¶¶4-5.)  As Hoover described the meeting:

> I told Mr. O'Neill that I was dissatisfied
> with Ms. Holpp's leadership of the account.
> I asked Mr. O'Neill to meet with Julian
> Ritchey, Michele Logan, and Joe Collins, the
> three [Aventis] Senior Managers who worked
> most closely with Ms. Holpp, to get their
> feedback on Ms. Holpp's performance.  I also
> told Mr. O'Neill that I would meet with Ms.
> Holpp myself before making a final
> determination with regard to her leadership
> of our account.

(Hoover Aff. ¶ 6.)[2]

Later that same day, O'Neill met with the three Aventis

Senior Account Managers ("Aventis Account Managers") who worked

regularly with Plaintiff--Julian Ritchey ("Ritchey"), Michele

Logan ("Logan"), and Joe Collins ("Collins").  Acknowledging that

Plaintiff had made some positive contributions to the Aventis

account, the Aventis Account Managers told O'Neill that they felt

that they "no longer could trust Ms. Holpp."  (Ritchey Dep. Tr.

48:1-12; Ritchey Aff. ¶ 4.)  Among their complaints was that

Plaintiff: (1) blamed others rather than take responsibility for

problems; (2) tried to play members of the Aventis team off of

one another; and (3) tried to parlay personal friendships and

sympathies into professional favors.  (Ritchey Aff. ¶ 3.)

─────────────────

[2]     Plaintiff argues that: (1) Hoover's deposition
testimony and sworn affidavit are not credible; and (2) that his
criticisms of her performance were misplaced.  (See e.g.
Plaintiff's Rule 56.1 Response ¶ 10 (stating that "prioritization
was Aventis' responsibility, not Ms. Holpp's").)  As discussed
later in this Opinion, neither argument raises a material issue
of fact for purposes of summary judgment.

According to Ritchey, the group did not reach a final decision at the meeting about how to handle these issues.[3]

Subsequently, on September 4, 2002, Hoover met with Holpp and explained his frustrations.  As Plaintiff testified at her deposition:

> Q.   During that meeting did [Hoover] express
>      any dissatisfaction with the way the
>      account was being handled?
> A.   Yes.
> Q.   What did he tell you?
> A.   ...I brought in additional business.
>      And he was frustrated that I would take
>      upon--take additional business and not
>      have staffing to manage this business.
>      That was his complaint.

(Holpp Dep. Tr. 88:23-89:9.)

Hoover asserts that this meeting was the point at which he concluded that Plaintiff should be taken off of the Aventis account.  Following that meeting, Hoover again spoke to O'Neill and told him that if ICC kept Plaintiff on the Aventis account, ICC's business with Aventis was at risk.  (Hoover Aff. at ¶8; Defendant's Br. at 8.)

O'Neill reported these concerns to his superiors, Viviano and Young.  (Viviano Dep. Tr. 22-26; Young Dep. Tr. 17:25-18:7.)

---

[3]    In Ritchey's words, "there was no specific resolution that what was going to be the new way things would run.  Rather there was an agreement that opponents [sic] were taken, appreciation to our concern was given, and at that point [O'Neill] was going to go back and try to understand what was happening in his organization to get Linda's perspective, et cetera."  (Ritchey Dep. Tr. 55:23-56:4.)

According to ICC, because of the concerns of Aventis, it decided to remove Holpp from the Aventis account.  (Defendant's Br. at 9.)

**II.  SUMMARY JUDGMENT STANDARD**

Summary judgment will be granted only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 65(c).  Whether a fact is material is determined by the applicable substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Healy v. N.Y. Life Ins. Co.</u>, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988), <u>cert. denied</u> 490 U.S. 1098 (1989).

The moving party has the initial burden of showing that no genuine issue of material fact exists.  <u>Celotex Corp. v. Carteret</u>, 477 U.S. 317, 323 (1986).  If the moving party satisfies this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial.  <u>Id.</u> at 324.  The nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed. R. Civ. P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor, <u>Anderson</u>, 477 U.S. at 249, and not just "some metaphysical doubt as to material facts," <u>Matsushita Elec.</u>

10

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility . . . against the moving party." Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983) (citing Smith v. Pittsburgh Gage & Supply Co., 464 F.2d 870, 874 (3d Cir. 1972)); accord Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1077 n.1 (3d Cir. 1996).

## III. PLAINTIFF'S FMLA CLAIMS

Plaintiff's FMLA claims arise from the leave she took in the early fall of 2002.  Plaintiff initially requested ICC to allow her to perform work from home and later asked for full medical leave guaranteed under the FMLA.  She claims that ICC interfered with her right to take FMLA leave and later retaliated against her by terminating her employment when she returned from leave. Defendant moves for summary judgment on the grounds that it in no way interfered or retaliated against Plaintiff for taking FMLA leave.

A plaintiff may seek relief for a violation of the FMLA under two theories; the interference/ entitlement theory and the retaliation/ discrimination theory. See 29 U.S.C. § 2615(a)(1) and (2); 29 C.F.R. § 825.220(c); see also Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 147 n.9 (3d Cir. 2004). Thus, the Court considers each of Plaintiff's claims according to

its underlying theory.

**A. Plaintiff's Interference/ Entitlement Theory Claims**

  1. Interference with Plaintiff's right to take FMLA leave.

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1). To assert a claim of deprivation of entitlements, Holpp need only show that she was entitled to the benefits of the FMLA and that she was denied them. Callison v. City of Philadelphia, 128 Fed.Appx. 897, 899 (3d Cir. 2005), cert. denied, 126 S.Ct. 389 (Oct. 3, 2005). The intent of the employer is immaterial. Id.; Parker v. Hahnemann University Hospital, 234 F.Supp.2d 478, 485 (D.N.J. 2002). To trigger the rights guaranteed under the FMLA, an employee need not actually mention the FMLA by name, "the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." Brohm v. Jh Props., 149 F.3d 517, 523 (6th Cir. 1998) (emphasis added) (citing Manuel v. Westlake Polymers Corp., 66 F.3d 758, 764 (5th Cir. 1995)); Barone v. Leukemia Soc'y of Am., 42 F.Supp.2d 452, 459-60 (D.N.J. 1998).

In its Motion for Summary Judgment, Defendant argues there is no genuine issue of material fact because Plaintiff was not

entitled to take FMLA leave until she actually requested it on October 2, 2002.  ICC contends that Holpp is unable to establish that Defendant interfered with Plaintiff's right to take FMLA leave because the evidence establishes that Plaintiff sought to work from home until October 2, 2002, and because Plaintiff cannot show any injury.

Plaintiff asserts that ICC interfered with her FMLA rights because she was entitled to take FMLA leave on September 9, 2002, when she informed O'Neill that her doctor instructed her not to work.  Plaintiff contends that ICC violated the purpose of the FMLA by denying her request for leave until October 7, 2002.  This denial, Plaintiff avers, first occurred when O'Neill asked her if she would consider working from home.  O'Neill's deposition testimony reflects the conversation he had with Plaintiff on September 9th:

> The substance of the conversation was [Holpp]
> told me that she could not - - what the
> doctor told told [sic] her, she could not
> drive to work, and I asked her if she would
> like to work from home as we needed the help
> since the way she phrased it was a driving
> issue. [Holpp] agreed to that and that was
> the gist of the whole conversation.

(O'Neill Dep. Tr. 99:4-10.)

Based on the information O'Neill received from Plaintiff on September 9, 2002, Plaintiff claims O'Neill "had no right to ask [her] to disobey her doctor's orders and work from home." (Plaintiff's Br. at 26.)  In support of this contention,

Plaintiff cites <u>Shtab v. The Greate Bay Hoteland Casino</u>, 173 F.Supp.2d 255 (D.N.J. 2001).  <u>Shtab</u>, however, is inapposite.

In <u>Shtab</u>, the court considered the issue of whether it is interference under the FMLA for an employer to suggest that an employee take different dates of leave in order to accommodate the employer.  <u>Shtab</u>, 173 F.Supp.2d at 267.  Shtab made a request for FMLA leave at which time his employer asked him to delay his leave until it was more convenient for the employer.  The court denied parties' cross motions for summary judgment on this issue on the grounds that the employer's request that Shtab delay his leave request may have ultimately "chilled" Shtab's FMLA rights. <u>Id</u>. at 267-68.  In this case, on the other hand, there is no doubt that Plaintiff either requested or agreed to work from home.

Defendant argues that Plaintiff's own testimony establishes that she voluntarily agreed to help out from home when she was unable to continue her normal daily work activities.[4]  (Holpp

---

[4]     On September 9, 2002, Plaintiff emailed O'Neill stating: "... just trying to work lying down in bed, not easy, but I care so much about the business and how things are going, I'm forcing myself." (Certification of Nirenberg, Plaintiff's Ex. N.)
    On September 24, 2002, Plaintiff emailed Turner stating: "I asked Paul on Thursday, and he told me to have Vickie put in regular time hours for last week.  As we have discussed I will do my best to help out from home, but I cannot do my job with my health situation.  I need to be reassured that the management requests to me during this period of time and my attempts to accomodate them, will not negatively impact my performance evaluation, nor my stature/position.  I want to come

Dep. Tr. 85:14-18; 176:5-11; 216:18-25; 217:2-7.)  It is not
disputed that Plaintiff continued to correspond with individuals
from ICC and Aventis and incur business-related expenses
throughout September 2002.  (Affidavit of Jennifer Moak,
Defendant's Ex. S.)  Upon her request that she could no longer
work from home, ICC argues it immediately forwarded to Plaintiff
forms that provided her with FMLA leave from October 1, 2002,
through January 2, 2003.[5]  (Certification of Nirenberg,
Plaintiff's Ex. V.)

There is no indication that ICC suggested to Plaintiff that
she was not entitled to take FMLA leave.  Plaintiff's deposition
testimony, in fact, provides the opposite:

> Q.   ... did O'Neill ever tell you that you
>      could not take medical leave?
> A.   He did not tell me I could not take
>      medical leave. No.
> Q.   Did Turner ever tell you you could not
>      take medical leave?
> A.   No. Turner told me I could.

(Holpp Dep. Tr. 211:13-20.)

---

back to work ASAP and resume my position requirements as I had
been doing up until my medical problem.  I will attempt to meet
management request during this period to the best of my ability,
so that I will continue to be viewed as a team player and help to
support my staff and the business in anyway I can.  Also, please
let me know if I need to do anything regarding the new employee
benefits."  (Certification of Nirenberg, Plaintiff's Ex. Q.)

[5]    On October 2, 2002, Plaintiff wrote in an email to
Turner that although "[she had] been trying to help out from home
to the best of [her] ability [] unfortunately [she could not]
continue to do so."  (Affidavit of Jennifer Moak, Defendant's Ex.
P.)

By offering to work, or help out, from home, Plaintiff did not reasonably apprise ICC of her desire to discontinue her work until October 2, 2002.  It was not for ICC to decide whether Plaintiff could or could not work from home.  By her own admissions and evidence, it is evident that Plaintiff offered to continue working from home during September 2002.[6]  The Court cannot allow Plaintiff to now use that offer against Defendant. It was Plaintiff's responsibility to reasonably apprise ICC that she could not work.  Holpp's averment that she was entitled to take FMLA leave on September 9, 2002, cannot overcome the fact she did not actually request leave at that time.

The Court recognizes that while employees may not waive, nor be induced to waive, their rights under the FMLA, this does not prevent an employee's voluntary and uncoerced acceptance of a "light duty" assignment while recovering from a serious health condition.  See 29 C.F.R. § 825.220(d).  The Court views Plaintiff's argument that she agreed to *help out* but not *work* from home as insufficient to establish anything but her voluntary request to perform work from home.  See e.g. Hoge v. Honda of Am. Mfg., 384 F.3d 238, 252 (6th Cir. 2004).

Moreover, Plaintiff is unable to show that she was denied her right to take leave under the FMLA.  Callison, 128 Fed.Appx.

---

[6]     Her claim that she continued to work for fear of losing her job is without merit because she fails to indicate any basis, aside from her own bald allegations, for that conclusion.

at 899.  Plaintiff was provided the 12 weeks' leave she was entitled to under the FMLA.  (Certification of Nirenberg, Plaintiff's Ex. V.)  She has therefore not sufficiently alleged an injury or that her injury is recognized by the FMLA.[7]  See Alifano v. Merck & Co., 175 F.Supp.2d 792, 794-95 (E.D.Pa. 2001).

2. Interference with Plaintiff's right to reinstatement.

The second part of Plaintiff's interference theory claim is that ICC interfered with her right to reinstatement.  Plaintiff's Complaint alleges ICC interfered with her rights under the FMLA by failing to restore her to the position she held prior to her leave or an equivalent position as required under 29 U.S.C. § 2614(a)(1).  (Plaintiff's Br. at 27.)  ICC argues Plaintiff is unable to state a claim on this ground because she was not entitled to reinstatement since she would have been fired regardless of taking FMLA leave.  Holpp contends her removal from the Aventis account was based on her taking FMLA guaranteed leave.  (Plaintiff's Br. at 29.)

The right to reinstatement is not absolute.  An employee is

_____

[7]    Plaintiff alleges emotional and physical distress as a result of ICC's failure to grant her FMLA leave in September 2002.  (Plaintiff's Br. at 26.)  Damages for emotional and physical distress, however, are not available under the FMLA. See 29 U.S.C. § 2617; Zawadowicz v. CVS Corp., 99 F.Supp.2d 518, 540 (D.N.J. 2000); Lloyd v. Wyoming Valley Health Care Sys., 994 F.Supp. 288 (M.D.Pa. 1998); Keene v. Rinaldi, 127 F.Supp.2d 770 (M.D.N.C. 2000).

17

not entitled to greater rights or benefits than she would have
had she not taken the leave.  Conoshenti, 364 F.3d at 141;
Bearley v. Friendly Ice Cream Corp., 322 F.Supp.2d 563, 571
(M.D.Pa. 2004).  "[I]f an employee is discharged during or at the
end of a protected leave for a reason unrelated to the leave,
there is no right to reinstatement." Id. at 141 (citing 29 C.F.R.
§ 825.216(a)(1)).  Furthermore, the FMLA does not provide
protection from layoff based on poor job performance.  See Taylor
v. Union Institute, 30 Fed.Appx. 443, 454 (6th Cir. 2002);
Potenza v. City of New York DOT, 2001 U.S. Dist. LEXIS 17112,
*27-28 (S.D.N.Y. 2001); Cohen v. Pitcairn Trust Co., 2001 U.S.
Dist. LEXIS 10876, *27-32 (E.D.Pa. 2001).

As previously stated, to successfully allege that an
employer interfered with an employee's rights under the FMLA, the
employee need only show that she was entitled to the benefits
under the FMLA and that she was denied them.  Callison, 128
Fed.Appx. at 899.  ICC is therefore required to bear the burden
of proving that Holpp's termination would have occurred had she
not taken FMLA leave.  Parker, 234 F.Supp.2d at 487; 29 C.F.R. §
825.216(a)(1).

It is uncontested that Hoover and O'Neill met in late August
2002 and discussed Holpp's performance on the Aventis account.
Subsequent to that meeting, O'Neill and Hoover both met
separately with Plaintiff.  Plaintiff testified at her deposition

regarding her meeting with Hoover:

> Q.   During that meeting did [Hoover] express
>      any dissatisfaction with the way the
>      account was being handled?
> A.   Yes.
> Q.   What did he tell you?
> A.   ...I brought in additional business.
>      And he was frustrated that I would take
>      upon--take additional business and not
>      have staffing to manage this business.
>      That was his complaint.

(Holpp Dep. Tr. 88:23-89:9.)

Hoover later requested O'Neill to remove Plaintiff from the account, threatening to otherwise terminate its $3 million contract with Defendant.   (Hoover Dep. Tr. at 26-39; Hoover Aff., ¶8; see also O'Neill Dep. Tr. at 72; Viviano Dep. Tr. at 29-30; Young Dep. Tr. 32-33.)

Plaintiff contends that Hoover's testimony is inconsistent and lacks credibility and, therefore, a reasonable juror may choose to ignore it.   Her argument lacks support.   First, it is undeniable from Plaintiff's testimony above that she knew Aventis had concerns as to her performance.

Secondly, Holpp relies on the testimony of Julian Ritchey, Senior Product Manager for Aventis, one of Plaintiff's primary contacts at Aventis.   (Ritchey Dep. Tr. 6:24-7:1; Plaintiff's Br. at 5.)   According to Plaintiff, Ritchey's testimony shows that O'Neill removed her from the Aventis account because she was on leave rather than due to her poor performance.   (Plaintiff's Br. at 32-33.)   Plaintiff distorts Ritchey's testimony and completely

ignores his opinion that Aventis was not satisfied with Holpp's performance.  (Ritchey Dep. Tr. 35:1-38:24; 51:5-17; 61:2-62:19; Ritchey Aff.)  Ritchey and Hoover's testimony is also supported by the testimony of O'Neill, Young and Viviano's; none of which is inconsistent.

All the facts reinforce Defendant's contention that Plaintiff's performance was unsatisfactory, that Aventis sought to remove her from their account prior to Plaintiff taking leave, and for those reasons she was terminated.  Holpp has not proffered any evidence that she was denied a right protected by the FMLA; therefore, she has failed to establish a sufficient disagreement worthy of being presented to a jury.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

**B. Plaintiff's Retaliation/ Discrimination Theory Claims**

The second theory under which Plaintiff brings a claim is 29 U.S.C. § 2915(a)(2).  Section 2915(a)(2) makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."  To prevail on this claim, Holpp must make a prima facie showing that (1) she took FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was casually related to her leave.  Conoshenti, 364 F.3d at 146-47.

In cases falling under the retaliation theory, courts

generally apply the burden-shifting framework established in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).
Parker, 234 F.Supp.2d. at 488.  By presenting evidence of a prima
facie case, the burden shifts to the defendant to articulate some
legitimate, nondiscriminatory reason for the employee's
termination.  The defendant must prove that it would have fired
the plaintiff even if it had not considered the FMLA leave.  "The
employer need not isolate the sole cause for the decision; rather
it must demonstrate that with the illegitimate factor removed
from the calculus, sufficient business reasons would have induced
it to take the same employment action."  Conoshenti, 364 F.3d at
147-48 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 276-77
(1989) (O'Connor, J., concurring)).

   1. Plaintiff's prima facie case.

   Defendant concedes that Plaintiff has met the first two
elements of her prima facie case; however, ICC argues that
Plaintiff is unable to establish the existence of a causal
connection between her FMLA leave and her termination.  In order
to establish the element of casual connection, Plaintiff
emphasizes that she was laid off the day she returned from FMLA
leave.[8]  (Plaintiff's Br. at 30-32.)  As noted in Parker, the

---

   [8]   The Court again rejects Plaintiff's argument as to the
discrepancy in the deposition testimony of O'Neill, Hoover,
Young, Turner and Ritchey.  Her argument lacks merit because
Plaintiff misrepresents the underlying theme of their testimony,
that is, Plaintiff's poor job performance.

Third Circuit has held that temporal proximity is suggestive of a casual connection for proving a prima facie case of retaliation. Parker, 234 F.Supp.2d at 492 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279-80 (3d Cir. 2000)).  Farrell, however, made clear that the Third Circuit was "not decid[ing] whether the timing alone would be sufficient," noting that "each case must be considered with a careful eye to the specific facts and circumstances encountered" and that "it is causation, not temporal proximity... that is an element of plaintiff's prima facie case, and temporal proximity... merely provides an evidentiary basis from which an inference can be drawn." Farrell, 206 F.3d at 280, 281.

The timing of Plaintiff's termination is not in any way "unusually suggestive," and the circumstances do not sustain an inference of causation.  Although Plaintiff was fired the day she returned to work, on December 16, 2002, the testimonial evidence and affidavits indicate that Aventis sought removal of Holpp from its account in late August and early September, prior to her working from home or going on FMLA leave.  (See e.g., Hoover Aff.; Ritchey Aff.; O'Neill Aff.)  ICC was under no obligation to warn Plaintiff of the complaints about her performance before her termination.  Keller v. Orix Credit Alliance, 130 F.3d 1101, 1111 (3d Cir. 1997) (en banc).  Furthermore, Holpp has not provided any evidence that would suggest the timing is indicative of a

retaliatory motive.  See e.g., Jalil v. Avdel Corp., 873 F.2d
701, 709 (3d Cir. 1989) (reversing summary judgment where the
timing of discharge was suggestive of a discriminatory motive
because employer discharged plaintiff two days after notice of
his EEOC claim); Farrell, 206 F.3d at 280-81 (reversing summary
judgment and finding an inference of causation based on the
entire record, including the suggestive timing); Parker, 234
F.Supp.2d at 492-93 (denying summary judgment on retaliation
claim and finding a causal connection where plaintiff established
that defendants eliminated her job a week prior to her return
because they became accustomed to working without her).  The fact
she was not informed until the day she returned is simply not
enough without some slight indication of how the timing is
suggestive of a wrongful motive.  Under the circumstances, the
timing alone does not carry the weight of Plaintiff's prima facie
case.

### 2. ICC's legitimate business purpose.

Assuming, *arguendo*, Plaintiff established a prima facie
case, she still fails to overcome ICC's legitimate purpose for
removing her from the Aventis account and terminating her
employment.

As previously stated, Aventis was the only ICC client
Plaintiff worked for, its contract with ICC was worth $3 million
per year, and it requested that Plaintiff be removed from its

account.  (Holpp Dep. Tr. at 49:14-18; Hoover Dep. Tr. at 26-39;
Hoover Aff., ¶¶8-9.)  Plaintiff's claims rest on bald allegations
and distortions of deposition testimony.  "The question is not
whether the employer made the best, or even a sound, business
decision; it is whether the real reason is discrimination."
Keller, 130 F.3d at 1109 (internal citations omitted).  See
Sempier v. Johnson & Higgins, 45 F.3d 724, 730 (3d Cir. 1995);
Leung v. SHK Management, Inc., 1999 WL 1240961, *5, 14-15
(E.D.Pa. Dec. 21, 1999) (finding poor job performance as a
legitimate business reason for terminating an employee).  Holpp,
therefore, must show not merely that ICC's proffered reason was
wrong, "but that it was so plainly wrong that it cannot have been
[ICC's] real reason."  Id.  As fully developed above, Plaintiff
is unable to make this showing.

**IV.  CONCLUSION**

     For the reasons set forth in this Opinion, Defendant's
motion for summary judgment is granted.  In light of the Court's
decision, Plaintiff's motion for partial summary judgment is
hereby denied.

     An appropriate Order follows.

Dated: December 15, 2005

                              /s/ William G. Bassler
                              William G. Bassler, U.S.S.D.J.

24